**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD JOHNSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH D. LEHMAN, ATTORNEY** | : | |
| **GENERAL OF PENNSYLVANIA** | : | |
| **and DISTRICT ATTORNEY OF** | : | |
| **PHILADELPHIA COUNTY** | : | **NO.  94-7583** |

**NORMA L. SHAPIRO, S.J.**                                        **MAY 31, 2007**

<u>**MEMORANDUM AND ORDER**</u>

Ronald Johnson ("Petitioner"), a state prisoner alleging ineffective assistance of

counsel, filed a counseled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner argues his trial counsel was ineffective because he failed to interview or call as

witnesses two people who would have supported Petitioner's alibi defense at his murder trial.

Magistrate Judge M. Faith Angell issued a report and recommendation ("R&R") that Petitioner's

petition be denied.  For the following reasons, the R&R will be adopted, and the petition for writ

of habeas corpus will be denied.  A certificate of appealability will be granted.

**I.        FACTS AND PROCEDURAL BACKGROUND**

Petitioner was tried before a jury in the Court of Common Pleas of Philadelphia

County for the murder of Joseph Goldsby ("Goldsby").  The trial judge, the Honorable Eugene

H. Clarke, Jr., summarized the trial facts as follows:

> "The testimony at trial established that the victim, Joseph Goldsby, died
> on March 1, 1990 of a gunshot wound to the chest.  [Goldsby] was at the location
> of 2100 Westmoreland Street selling drugs.  [Petitioner] approached with an
> unknown male and female and engaged [Goldsby] in a drug-related conversation.
> The unknown male got into [Goldsby's] vehicle and after a few minutes gunshots
> were heard.  [Goldsby's] car moved forward and crashed into a telephone pole.
> [Petitioner] aimed a gun into the vehicle and pulled the trigger but it misfired.  As
> [Petitioner's] co-hort [sic] exited the vehicle, he struggled with [Goldsby] and

yelled at him to "give it up." [Goldsby] chased after the man for a few steps but collapsed on the sidewalk. [Petitioner] and his co-conspirator fled the scene in the same direction. Two witnesses to the incident, Darryl Alexander and Mark Jackson, testified that they knew [Petitioner] and detailed his involvement in the murder. Mark Jackson also testified to being approached by [Petitioner] several days later and told to be careful what you say.

"[Petitioner] testified and called as a witness, Richard Duncan, to establish an alibi defense. They testified that they were in the car getting high and unaware of Mr. Goldsby's murder until they were told by a man named James Smith, also known as 'Seed.'" (Petr.'s Mem. Supp. Pet. Writ Habeas Corpus, Ex. C, <u>Commonwealth v. Johnson</u> (C.P. Oct. 28, 1993)).

### A.     Testimony of Darryl Alexander

The Commonwealth presented three eyewitnesses at Petitioner's trial, two of whom implicated Petitioner in Goldsby's murder. The first eyewitness, Darryl Alexander ("Alexander"), testified that on March 1, 1990, at approximately 9:00 p.m., he encountered Goldsby on 21st and Westmoreland Street and got into Goldsby's car. He spent approximately three to four minutes in Goldsby's car purchasing five dollars of crack cocaine, after which he observed a group of people purchasing crack from Goldsby. Alexander attempted to sell fake cocaine to two men waiting for Goldsby; Alexander later identified one of these two men as Petitioner. According to Alexander, Petitioner and the unidentified man waited for Goldsby for approximately fifteen to twenty minutes. After the people purchasing narcotics from Goldsby left, the unidentified man accompanying Petitioner got into the passenger side of Goldsby's car for approximately ten minutes. Alexander bent down to speak with Goldsby, but glass shattered in his face and he heard a gunshot. Alexander saw Goldsby and the man in the passenger seat struggling. Alexander ran to the corner of 21st and Westmoreland Street; he heard two more gunshots and yelled for the police. Goldsby's car rolled up the street and ran into a pole. Alexander ran towards the car and, when approximately two houses away, observed Petitioner,

outside Goldsby's car, flash an automatic, stick his hand in the window, and pull the trigger. The gun did not go off.  Alexander identified Petitioner in court as the man outside the car who pulled the trigger.  (Trial Tr. vol. 3, 57, Oct. 22, 1991.)  According to Alexander, Alexander then turned around and ran in the other direction.  Goldsby and the man in the passenger side struggled out of the car; Goldsby broke loose, took three or four steps, and collapsed.  (Trial Tr. vol. 3, 48-66, Oct. 22, 1991.)  Alexander also testified Mark Jackson ("Jackson") was standing in the middle of Westmoreland Street during the incident.  (Trial Tr. vol. 3, 61, Oct. 22, 1991.)

On cross-examination, Alexander affirmed he had seen Petitioner approximately a month prior to Goldsby's murder.  (Trial Tr. vol. 3, 115, Oct. 22, 1991.)  But he acknowledged that in his first police statement, Alexander reported he did not recognize either of the men involved in Goldsby's murder.  (Trial Tr. vol. 3, 97-105, Oct. 22, 1991.)  On further direct examination, Alexander testified that in his third police statement, he linked Petitioner's photograph with the man outside Goldsby's car whose gun misfired.  (Trial Tr. vol. 3, 124, Oct. 22, 1991.)

**B.**     **Testimony of Anita Stewart**

The Commonwealth's second eyewitness, Anita Stewart ("Stewart") testified that she was in her second floor bedroom when she heard two or three gunshots and a crash.  Stewart looked out the window and observed a car that had run into a pole and a man standing outside the car waving a gun; but she did not see the face of the man waving the gun.  (Trial Tr. vol. 3, 126-28, Oct. 22, 1991.)  Stewart stated Petitioner looked "a little bit bigger" than the man she saw waving the gun, but Petitioner's skin color was "about the same."  (Trial Tr. vol. 3, 131, Oct. 22, 1991.)

3

### C.    Testimony of Mark Alan Jackson

The Commonwealth's third eyewitness was Mark Alan Jackson ("Jackson"). Jackson testified that he was walking on the 2100 block of Westmoreland Street on March 1, 1990, when he saw Goldsby.  Jackson spoke with Goldsby and later noticed Alexander speaking with Goldsby.  According to Jackson, there were six or seven people purchasing narcotics by Goldsby's car.  Two men and a woman approached.  The crowd thinned out and the two men, one of whom Jackson later identified as Petitioner, stayed to decide whether they wanted to buy from Goldsby.  Jackson saw one of the men get into Goldsby's car to taste the narcotics; the other man, Petitioner, stood approximately ten or fifteen feet in front of Goldsby's car.  Jackson walked away towards 21st Street, but when he heard a gunshot he turned around and observed a scuffle in the car.  Jackson heard two more gunshots and saw Goldsby's car coast forward and strike a light pole.  Jackson testified Petitioner walked towards Goldsby's vehicle, pointed a gun inside the car, and pressed the trigger, but the gun did not go off.  Jackson saw the man in the passenger side of Goldsby's car drag Goldsby out and point a pistol at Goldsby's head.  Jackson walked from the corner to the middle of the street and yelled for the police, and Petitioner and his accomplice ran away.  Goldsby ran towards the two men and collapsed.  (Trial Tr. vol. 5, 3-13, Oct. 24, 1991.)  Jackson identified Petitioner in court as the man who pointed his gun in the driver's side of Goldsby's car and pulled the trigger; he stated he had known Petitioner from the area for approximately ten years but never associated with him personally.  (Trial Tr. vol. 5, 10-11, Oct. 24, 1991.)  Jackson also testified that approximately three or four days after the incident, Petitioner told him to be careful about what he says.  (Trial Tr. vol. 5, 15, Oct. 24, 1991.)

On cross-examination, Jackson testified that he left the scene of the incident when he heard the police because, at the time, there was an outstanding bench warrant on him. Approximately four days after the incident, Jackson called the police, went to the police station, and gave the police some statements regarding Goldsby's murder. Jackson acknowledged that in his police statement of March 5, 1990, he reported that he did not know either of the men who took part in the shooting. Jackson also reported in the police statement of March 5, 1990, that he knew Petitioner and thought he was involved in Goldsby's shooting, but that Petitioner was not at the scene of the shooting. In Jackson's police statement of March 20, 1990, he reported he learned that a man named David Johnson had been in the passenger seat and had shot Goldsby, and a man with the last name of Duncan had been his accomplice. (Trial Tr. vol. 5, 22-32, Oct. 24, 1991.)

On redirect examination, Jackson testified he had feared for his life and that of his family when he spoke to the police on March 5, 1990, and March 20, 1990, and Jackson's grandmother threatened Jackson not to give any information to the police regarding the case. Jackson later decided justice needed to be served and went to the police on March 29, 1990; he identified Petitioner from a group of photographs as involved in Goldsby's shooting. On April 16, 1990, Jackson again identified Petitioner to the police. Jackson stated he had "no doubt" that Petitioner was the man who placed a gun inside the driver's side window of Goldsby's car and attempted to fire a gun. (Trial Tr. vol. 5, 34-37, Oct. 24, 1991.) On further cross-examination, Jackson testified that in his statement of March 29, 1990, he told the police that Petitioner was the man who got into the car and shot Goldsby (Trial Tr. vol. 5, 38-39, Oct. 24, 1991) rather than the man who pulled the trigger outside the car. On further direct examination, Jackson testified

that in his statement of April 16, 1990, he told police Petitioner was the shorter of the two men involved in Goldsby's shooting, and the taller man got into the car with Goldsby.  (Trial Tr. vol. 5, 39-40, Oct. 24, 1991.)

> **D.      Other Commonwealth testimony**

Detective John Main testified there was no money found at the scene of Goldsby's shooting.  (Trial Tr. vol. 3, 47, Oct. 22, 1991.)  Detective Frank McGuiork, the assigned homicide detective, testified Darryl Alexander was shown a photo spread on April 9, 1990, and identified Petitioner as the man with the shooter.  (Trial Tr. vol. 4, 44, Oct. 23, 1991.)

> **E.      Alibi testimony of Richard Duncan**

Petitioner presented an alibi defense at trial.  Petitioner's first witness, Richard Duncan ("Duncan") testified that he was with Petitioner all day on March 1, 1990; and at approximately 9:00 or 9:30 p.m., Duncan and Petitioner were standing outside a bar at 21st and Madison Street.  According to Duncan, he and Petitioner picked up a man named Kenneth Gaskins and dropped him off at his girlfriend's house.  Later, Duncan and Petitioner went to a gas station around Broad and Glenwood Streets, then to Hutchinson and Clearfield to buy some cocaine vials.  They parked behind the "Budd's" building near 23rd Street and Huntingdon Park to get high.  At approximately 10:30 p.m., a man named Jimmy Seed mentioned to Duncan and Petitioner that Goldsby had been shot; but Duncan and Petitioner continued to get high for the next two days.  (Trial Tr. vol. 5, 50-56, Oct. 24, 1991.)

On cross-examination, following the Commonwealth witness testimony that no money was found at the scene of Goldsby's shooting, the Commonwealth attempted to show that Petitioner robbed Goldsby of his money, by contrasting the amount of money Petitioner spent

earlier on the evening of March 1, 1990, with the amount of money Petitioner spent later in the evening.  Duncan testified he had been friends with Petitioner since elementary school.  Duncan also knew Goldsby was a drug dealer, and he and Petitioner asked for Goldsby when they were at 21st and Madison Street.  Duncan was not carrying any money at the time, and did not know how much money Petitioner carried.  When Duncan and Petitioner went to the gas station, Petitioner bought only a dollar's worth of gas; but after leaving the gas station, Petitioner bought twenty dollars worth of drugs.  Petitioner and Duncan then parked near 23rd Street and Huntingdon Park, approximately two-and-a-half to three blocks from Westmoreland Street, and sat with Jimmy Seed for an hour to an hour-and-a-half.  Over the next two days, Petitioner and Duncan spent approximately fifty dollars on crack cocaine.  Duncan and Petitioner spoke about Goldsby's shooting approximately a month after it occurred.  (Trial Tr. vol. 5, 58-80, Oct. 24, 1991.)  On redirect examination, Duncan testified that in his police statement, he reported Petitioner may have carried twenty dollars, and that he sold his car parts for drug money.  (Trial Tr. vol. 5, 81, Oct. 24, 1991.)

      **F.**    **Alibi testimony of Petitioner**

      On direct examination, Petitioner testified that at approximately 9:00 p.m. on March 1, 1990, he went to the bar at 21st and Madison Street and asked Kenneth Gaskins if he had seen "Gip, Tim or Joe [Goldsby]."  Later, Petitioner, Duncan, and Gaskins went to Gaskins' girlfriend's house.  Petitioner claimed that although he paid only a dollar at the gas station, he had been carrying twenty dollars from his brother.  At approximately 9:40 or 9:45 p.m., Petitioner and Duncan went to Clearfield and Hutchinson Streets to buy four vials of drugs; afterwards, they parked beside Jimmy Seed behind the Budd's building.  Seed and his friend Joel

7

got into Petitioner and Duncan's car, and the four men got high together.  When Joel left the car

to purchase more drugs, Seed told Petitioner and Duncan that Goldsby had been shot.  Petitioner

and Duncan drove Joel home.  They went to find Petitioner's brother to get some more money,

then to Seed's apartment.  In the early hours of the morning, Petitioner, Duncan, and Seed

returned to Hutchinson Street to buy more drugs; they returned to the Budd's building and stayed

until morning.  (Trial Tr. vol. 5, 83-91, Oct. 24, 1991.)

On cross-examination, the Commonwealth continued to develop its theory that

Petitioner attempted to shoot Goldsby and stole his money.  Petitioner testified he made a

statement to the police that he had only two dollars when he went on the street the night of

March 1, 1990; but according to Petitioner, the statement was not true because Petitioner was

high.  Petitioner also testified on cross-examination that he drove Kenneth Gaskins to his

girlfriend's house in exchange for $1.25 or $1.50.  Petitioner purchased approximately $100 of

crack on March 1, 1990.  Petitioner testified he discovered from Seed that Goldsby was shot at

10:30 or 11:00 p.m.; but Petitioner reported to the police that he heard about the shooting at 9:20

p.m..  According to Petitioner, he never spoke with Duncan about what they would tell the police

or what they would testify.  (Trial Tr. vol. 5, 100-115, Oct. 24, 1991.)

### G.    Police statements of Robin Johnson and Derrick Holmes

Robin Johnson and Derrick Holmes, two witnesses present at the scene of

Goldsby's murder, gave statements to the police shortly after the date of the crime; Petitioner's

trial counsel reviewed these statements, but did not interview Robin Johnson or Derrick Holmes,

and did not call them as witnesses at Petitioner's trial.  The crux of Petitioner's ineffective

assistance of counsel claim is that the testimony of Robin Johnson and Derrick Holmes would

have supported his alibi defense, and it was unreasonable and prejudicial for Petitioner's trial

counsel to fail to interview Robin Johnson and Derrick Holmes after reviewing their police

statements.

The pertinent part of Robin Johnson's March 22, 1990, police statement,

describing the people at the scene of Goldsby's shooting, reads:

A)   Me and Derrick walked over to the car on the driver side and the window was rolled midway down and [Alexander] was standing right by the driver side and said "Don't come up to the car" . . .

Q)   Did you see [Holmes] talking to someone right after he bought his caps and let somebody taste his cap?

A)   I don't remember if that happened or didn't because I had my caps and I was walking away.

Q)   Did you talk to anyone out on Westmoreland besides Joe and Corte?

A)   yea I talked to a guy standing on 21st & Westmoreland St across from where the car was parked.  The car was on the left hand side of the street and the guy was standing on the right.  The guy asked me if I knew where anything was and I said no.

Q)   Did you know what he meant when he said "Do you know where anything is"?

A)   yea, he was talking about capsules.

Q)   Describe the guy as you remember him?

A)   Tall about at least 6' brown skin and I think he had a beige coat.

Q)    I showed you a display of 8 photographs and you indicated one of the photographs was the guy you talked to.  Which one of these males did you talk to?

A)   This is the guy I talked to.  (Indicating PP#686996 of Shawn Duncan).

Q)   Did you see anyone else with this male whose photo you picked?

A)   No.

Q)   Do you know for sure whether he was alone?

A)   I don't know if he was alone or not but I didn't see anybody with him when I talked to him.

Q)   Have you ever seen this guy before?

A)   yea now that I looked at him I realize I've seen him hanging in the 1900 blk Erie Ave.  He hangs with David Johnson, Gregory Johnson, the stokes [sic] who live next to Johnson and he hangs with my kids father Marty Crockett.  They play ball together.

Q)   Did you know him when you spoke with him that night?

A)   no I really didn't pay attention to who he was that night.  He was just a guy who walked up and was looking to buy caps.

9

Q)   Did you see him with any weapons when you spoke to him?
A)   no.
Q)   Was Derrick with you when you spoke to him?
A)   yes.
Q)   Who else do you remember seeing on the street at that point?
A)   me, Derrick, Corte and Joe is all I remember.
Q)   Do you know Mark Jackson?
A)   yea.
Q)   Do you remember seeing him out on Westmoreland St?
A)   nope.
Q)   Could he have been their [sic]?
A)   yea he could have been there.
Q)   Do you know Kenny Gaston/Gaskin?
A)   Kenny Gaskins from 20th & Estaugh St.
Q)   Have you seen Kenny lately?
A)   no I don't even see him at the bar no more at 22nd & Pacific.
Q)   Is there anything else that you can remember about this incident?
A)   no that's it.  That's everything.

(Mem. Law Supp. Pet. Writ Habeas Corpus, Ex. A.)

The pertinent part of Derrick Holmes' March 22, 1990, police statement,

describing the people at the scene of Goldsby's shooting, reads:

Q)   Do you remember anyone coming up to you after you bought your caps
     and asking you for a taste?
A)   no.
Q)   Is there a possibility that someone approached you when you finished
     buying your caps?
A)   It's possible but if they did I didn't pay any attention to them.
Q)   Approximately how many people were out there after the car pulled up
     and parked?
A)   As I recall it was in the neighborhood of 4 or 5.
Q)   Out of those 4 or 5 how many did you know?
A)   I know Moon was there and so was Robin.  I didn't know any of the
     others.
Q)   Had you seen any of the others?
A)   I might have but I don't recall.
Q)   The guy that approach [sic] you initially and tried to sell you drugs, did
     you know him?
A)   no.
Q)   Did you know Joe Goldsby?
A)   no.  I'm sure I seen him around but I didn't recognize him that night.

Q)      Did you see who did the shooting?
A)      nope.
Q)      Did you know if the person that did the shooting was in the car?
A)      no I don't know . . .
Q)      Before you left running, did you see anyone get out of the car?
A)      no and from my periff(eral [sic] vision I didn't see anybody.  I saw that the car looked white.
Q)      I'm going to show you a group of 8 photographs and tell me if any of these males look like anyone that was out there when Joe Goldsby got shot?
A)      none of these look familiar.
Q)      Are you saying that none of these 8 were out there?
A)      I'm not saying they weren't there I just didn't see them . . .
Q)      Did you remember anyone coming up to you at any time and asking you about your drugs or asking you where to get drugs that night?
A)      no.

(Mem. Law Supp. Pet. Writ Habeas Corpus, Ex. B.)

**H.      Post-trial verdict motions**

On October 28, 1991, Petitioner was found guilty of murder in the first degree, criminal conspiracy, and possession of instruments of crime.  The jury deadlocked on the death penalty, so Judge Clarke sentenced Petitioner to life imprisonment.  Trial counsel filed a motion for a new trial and/or arrest of judgment.  New counsel was retained; she filed supplemental post-verdict motions based on ineffective assistance of counsel.  Judge Clarke held evidentiary hearings on May 26, 1992, January 11, 1993, and February 1, 1993, at which Derrick Holmes and Robin Johnson testified they did not observe Petitioner at the scene of Goldsby's shooting, but Petitioner's trial counsel never subpoenaed them or contacted them for an interview.

**1.      Testimony of Derrick Holmes**

At the evidentiary hearing on May 26, 1992, Petitioner presented the two witnesses, Robin Johnson and Derrick Holmes, who he claimed would have supported his alibi defense.  Derrick Holmes, an employee of the navy base in Warminster, testified that he had

11

seen Petitioner before the night of the shooting.  On the night of the incident, Derrick Holmes purchased narcotics from Goldsby and observed other people in the immediate area, but Petitioner was not present.  Under a minute after Derrick Holmes walked away from Goldsby's car, Derrick Holmes was in the middle of Westmoreland Street and heard gunshots.  Derrick Holmes ran and crouched by the side of a van, then got up and ran down Westmoreland Street; later, Derrick Holmes met up with a woman named Robin Johnson.  (Post-Trial Hr'g Tr. 16-21, May 26, 1992.)  Derrick Holmes also testified that he would have been available to come to court under a subpoena; but after he gave a statement to the police, no one spoke to him regarding Petitioner's trial until Petitioner's post-trial investigator contacted him.  (Post-Trial Hr'g Tr. 20, May 26, 1992.)

On cross-examination, Derrick Holmes testified that in his police statement, he reported that he knew several of the people at the scene prior to Goldsby's shooting, and that he may have previously seen the others, but he did not recall.  Derrick Holmes also conceded that he reported to the police he did not see who shot Goldsby and did not know if the person who shot Goldsby was in the car.  (Post-Trial Hr'g Tr. 21-23, May 26, 1992.)  On redirect examination, Derrick Holmes testified that there were only four or five people at the scene of the shooting; he knew a couple by name and would know others by face; but Petitioner was not one of the people on the scene when Derrick Holmes was there.  (Post-Trial Hr'g Tr. 26-26, May 26, 1992.)

**2.      Testimony of Robin Johnson**

At the evidentiary hearing on February 1, 1993, Robin Johnson testified that she

had known Goldsby for almost twenty years.  She was not related to Petitioner and did not know him personally, but she would have recognized Petitioner if she had seen him the day of the shooting.  According to Robin Johnson, on March 1, 1990, when Goldsby was shot, she was present at the scene with Derrick Holmes.  She observed a man named Sean Duncan get out of Goldsby's car; she also observed Alexander standing outside Goldsby's car, and Jackson standing at the far end of the corner across the street.  She did not observe Petitioner in the vicinity.  She heard Alexander call Sean Duncan to the car and tell him to get in.  Robin Johnson testified she began to walk across the street; when she heard a gunshot she ran behind a car.  She conceded she did not see the actual shooting; Derrick Holmes kept pulling her down as she attempted to look through the car window at what was happening.  Robin Johnson affirmed that she did not see Petitioner on the scene.  After the shooting, she ran around the corner.  (Post-Verdict Hr'g Tr. vol. 2, 18-22, Feb. 1, 1993.)  Robin Johnson also testified she gave a statement to the police but no one contacted her to testify at Petitioner's trial.  (Post-Verdict Hr'g Tr. vol. 2, 23, Feb. 1, 1993.)

On cross-examination, Robin Johnson testified that she was addicted to crack cocaine on March 22, 1990, but had only consumed two beers on the night of Goldsby's shooting.  (Post-Verdict Hr'g Tr. vol. 2, 24, Feb. 1, 1993.)  The Commonwealth emphasized inconsistencies between Robin Johnson's in-court testimony that she saw Sean Duncan get into Goldsby's car, and her statements to the police that she could not see anyone in the car with Goldsby; the Commonwealth also emphasized the inconsistency between Robin Johnson's in-court testimony that Jackson was at the scene of the shooting, with her statement to the police that Jackson was not at the scene.  (Post-Verdict Hr'g Tr. vol. 2, 25-28, Feb. 1, 1993.)

### 3.        Testimony of Petitioner's trial counsel

At the hearing on January 11, 1993, Petitioner's trial counsel, Richard Johnson,

testified as a witness for the Commonwealth.  According to trial counsel, he prepared for

Petitioner's trial by meeting with Petitioner, and Petitioner's mother and brother, three or four

times.  He told Petitioner to bring any witnesses to him.  Petitioner and his brother named

Duncan and Kenneth Gaskins[1] as witnesses.  Petitioner did not inform trial counsel of any other

witnesses.  Trial counsel met with Duncan on two occasions, but did not meet with Kenneth

Gaskins.  Petitioner's brother assured trial counsel he would bring Gaskins to him, but never did;

and trial counsel repeatedly attempted to contact Gaskins to no avail.  Duncan was the only alibi

witness of whom the Commonwealth was notified. (P.C.H.A. Hr'g Tr. 5-32, Jan. 11, 1993.)

On cross-examination, trial counsel testified that as a trial lawyer, he generally

relied on his clients to identify potential witnesses because his clients are the ones on the scene

of the crime and have everything at stake.  Trial counsel acknowledged that Petitioner was in

prison with limited phone privileges 14 months prior to trial.  Though Petitioner's brother was

identified in Jackson's police statement of March 20, 1990, as one of the culprits in Goldsby's

shooting, trial counsel relied upon Petitioner's brother to secure witnesses for Petitioner's trial.

Trial counsel reviewed the police statements of Derrick Holmes and Robin Johnson with

Petitioner, but never spoke with Derrick Holmes or Robin Johnson personally.  He testified that

he  did not contact or interview Derrick Holmes because Derrick Holmes' police statement did

not mention Petitioner.  (P.C.H.A. Hr'g Tr. 33-42, Jan. 11, 1993.)

---

[1]  Kenneth Gaskins is referred to as "Kenny Gaston" in the P.C.H.A. hearing transcript of
January 11, 1993.  The court will continue to refer to this individual as "Kenneth Gaskins" for
the sake of clarity.

After the evidentiary hearings and argument on the post-verdict motions, Petitioner's request for post-verdict relief was denied.  With respect to Petitioner's ineffective assistance of counsel claim, Judge Clarke decided that under <u>Strickland v. Washington</u>, it was reasonable for trial counsel to rely on Petitioner's brother to ensure the availability of witnesses, and to forgo interviewing witnesses whose statements to the police did not identify anyone from the scene of the shooting.  (Mem. Law Supp. Pet. Writ Habeas Corpus. Ex. C at 5; <u>Commonwealth v. Johnson</u> (C.P. Oct. 28, 1993)).  Judge Clarke further decided trial counsel's actions were not prejudicial to Petitioner because neither Derrick Holmes nor Robin Johnson provided Petitioner with an alibi, and the type of testimony they would have provided would not likely have caused a different result.  <u>Id</u>. at 6.

## I.      Procedural history of Petitioner's ineffective assistance of counsel claim

On July 29, 1993, Petitioner was formally sentenced to life imprisonment for murder and to concurrent prison terms for the remaining charges.  Petitioner appealed his conviction to the Superior Court of Pennsylvania on the grounds that: (1) trial counsel was ineffective in failing to interview and produce Derrick Holmes and Renee Robin Johnson as defense witnesses at trial; (2) trial counsel was ineffective in failing to cross-examine prosecution witness Mark Alan Jackson regarding bias from his pending criminal charges; and (3) post-verdict motions counsel was ineffective in failing to fully and properly advance and preserve Petitioner's ineffective assistance of counsel claims.  On April 7, 1994, the Superior Court, relying on the trial court's disposition of Petitioner's ineffectiveness of counsel claim, affirmed the trial court's judgment of sentence.  (Mem. Law Supp. Pet. Writ Habeas Corpus. Ex.

15

D at 3; Commonwealth v. Johnson (Pa. Sup. Ct. Apr. 7, 1994)).  The Supreme Court of Pennsylvania denied *allocatur*.

On December 19, 1994, Petitioner filed a petition for writ of habeas corpus, claiming ineffective assistance of counsel, with this court.  The court granted respondents' motion to dismiss, without prejudice, because Petitioner had not exhausted his state court remedies on all claims.  Johnson v. Lehman, et al., No. 94-7583 (E.D. Pa. Dec. 15, 1999).

On August 27, 1999, Petitioner, alleging newly discovered evidence, filed a Pennsylvania Post-Conviction Relief Act ("PCRA") petition for relief from his conviction.  The Court of Common Pleas dismissed the PCRA petition and the Superior Court affirmed denial of relief.  The Pennsylvania Supreme Court having denied Petitioner's Petition for Allowance of Appeal, Petitioner's state court remedies were exhausted on June 24, 2003.

Petitioner filed a motion to reinstate his petition for a writ of habeas corpus with this court.  By order of March 18, 2004, this court instructed Petitioner to file a motion pursuant to Fed.R.Civ.P. 60(b) or to file a new petition for habeas corpus.  Petitioner's Fed.R.Civ.P. 60(b) motion requested review of his ineffective assistance of counsel claim that the jury never heard from two eyewitnesses who knew Petitioner and could have testified that he was not one of the perpetrators in Goldsby's homicide.  The court granted the motion, and Petitioner's petition was referred to Magistrate Judge Angell for consideration of the merits of Petitioner's claims.  Magistrate Judge Angell filed an R&R, Petitioner filed objections, and the Commonwealth filed responses to Petitioner's objections.  The court heard oral argument on Petitioner's ineffective assistance of counsel claim.

## II.    REPORT AND RECOMMENDATION

The Magistrate Judge recommended that the petition be denied.  Magistrate Judge Angell found trial counsel's performance deficient because it was "unreasonable to rely exclusively on Petitioner and his brother to find potential witnesses, ignoring two known eyewitnesses."  (R&R 8.)  Judge Angell also found that evidence against Petitioner was not overwhelming.  (R&R 9.)  Nonetheless, Judge Angell found trial counsel's deficient performance was not prejudicial to Petitioner because a reasonable jury, hearing the weak alibi defense even with the supporting testimony of Robin Johnson and Derek Holmes, would not have determined that Petitioner was not guilty.  (R&R 12.)

Petitioner's *pro se* objections to the R&R reasserted Petitioner's ineffective assistance of counsel claim based on trial counsel's failure to contact or interview Robin Johnson and Derrick Holmes.  Counsel for Petitioner was appointed and filed a memorandum in support of the habeas petition; respondents filed a responsive memorandum.[2]

## III.    STANDARD OF REVIEW

### A.    Report and Recommendation

---

[2]  At the hearing before this court on October 18, 2006, counsel for Petitioner brought up, but did not brief, the issue of another ineffective assistance of counsel claim in Petitioner's habeas corpus petition.  This second ineffective assistance of counsel claim alleges trial counsel was ineffective because he made a deal with the District Attorney not to cross-examine prosecution witness Mark Jackson concerning criminal charges in Florida, in exchange for the District Attorney's agreement not to cross-examine Petitioner concerning witness intimidation.  (Hr'g Tr. 19-20, Oct. 18, 2006.)  Counsel for Petitioner argued that the issue had never been officially removed from the case.  (Hr'g Tr. 19-20, Oct. 18, 2006.)  However, counsel for Petitioner conceded that by letter of July 7, 1999, Petitioner's former counsel stated he would argue only Petitioner's ineffective assistance of counsel claim based on the failure to contact Derrick Holmes and Robin Johnson; the District Attorney's Office confirmed the letter.  (Hr'g Tr. 21, Oct. 18, 2006.)  The court construes the letter as an abandonment of Petitioner's second ineffective assistance of counsel claim.

The portions of a magistrate judge's report and recommendation to which objection is made are reviewed *de novo*.  See 28 U.S.C. § 636(b)(1)(C).

**B.      State Court Decision**

Petitioner's federal habeas petition was pending prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so this case must be decided by the law as it existed before AEDPA became effective.  See Lindh v. Murphy, 521 U.S. 320, 322-23 (1997); Buehl v. Vaughn, 166 F.3d 163, 169 (3d Cir. 1999).  Under pre-AEDPA law, ineffective assistance of counsel claims present mixed questions of law and fact.  Buehl, 166 F.3d at 169.  State court findings of fact are presumed correct if they are fairly supported by the record, but whether counsel was effective is subject to *de novo* review.  Id.

**IV.   DISCUSSION**

Under Strickland v. Washington, 466 U.S. 668 (1984), an ineffective assistance of counsel claim has two components.  First, Petitioner must show that counsel's performance was deficient.  Strickland, 466 U.S. at 687.  The court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 690.  Counsel is strongly presumed to have provided adequate assistance and made all significant decisions with reasonable professional judgment.  Id.  "Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-91.

18

In <u>United States v. Gray</u>, 878 F.2d 702, 704 (3d Cir. 1989), defendant was charged with possession of a firearm as a convicted felon, and he claimed self-defense. Trial counsel met with defendant and one witness, defendant's brother, in preparation for trial; counsel also discussed potential witnesses with defendant and asked him to investigate potential witnesses. <u>Gray</u>, 878 F.2d at 708. The court found trial counsel's performance deficient because he did not go to the scene of the incident to interview potential witnesses, he made no effort to contact any of four known witnesses, and he did not hire an investigator to track down witnesses. <u>Id</u>. at 711-712. The court also decided counsel's behavior was not based on tactical considerations but upon a lack of diligence, and counsel had completely abdicated his duty to investigate. <u>Id</u>. at 712.

<u>Strickland</u> then requires Petitioner to show that the deficient performance prejudiced the defense. <u>Id</u>. at 687. In a challenge to a conviction, prejudice is found where there is a reasonable probability that, but for counsel's unprofessional errors, the factfinder would have had a reasonable doubt respecting guilt. <u>See id</u>. at 694-95. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. A weakly supported verdict is more likely to have been affected by errors than a verdict with overwhelming evidentiary support. <u>Id</u>. at 696.

In preparation for Petitioner's trial, counsel spoke with Petitioner, Petitioner's mother, Petitioner's brother, who was a potential suspect in Goldsby's shooting, and Richard Duncan, whom Petitioner identified as an alibi witness. Trial counsel did not hire an investigator to find potential witnesses and he did not attempt to contact or interview Robin Johnson or Derrick Holmes, despite that he had seen police statements placing them at the scene of the

19

shooting.  This investigation was less than complete.  Trial counsel testified at Petitioner's post-trial hearing that he did not contact Robin Johnson or Derrick Holmes because their police statements did not mention Petitioner.  Contrary to respondents' argument, this explanation of trial counsel's failure to investigate does not exhibit the reasonable professional judgment required by Strickland.  Petitioner had an alibi defense, so the fact that Robin Johnson and Derrick Holmes did not identify Petitioner as present at the scene of Goldsby's shooting would tend to bolster, rather than detract from, the potential value of their testimony at trial.

Trial counsel also conceded at the post-trial hearing that he generally relies upon his clients to identify witnesses.  In this case, it was unreasonable for trial counsel to rely solely upon Petitioner, who was in prison with limited phone privileges, and Petitioner's brother, who was identified as a potential suspect in Goldsby's shooting, to secure witnesses for Petitioner's trial.  Trial counsel explained he relied on his clients to produce witnesses because his clients are the ones at the scene of the crime.  Again, this explanation for trial counsel's failure to fully investigate Petitioner's case does not exhibit reasonable professional judgment, because Petitioner had an alibi defense and therefore could not identify witnesses at the scene of Goldsby's shooting.

Trial counsel's investigation of Petitioner's case was less than complete; since Petitioner asserted an alibi defense, the court must conclude that trial counsel's failure to contact Robin Johnson and Derrick Holmes, who might have supported Petitioner's alibi, was not based upon tactical considerations, but upon a lack of diligence.  Trial counsel's performance was objectively unreasonable and deficient as contemplated under Strickland.

But whether there is a reasonable probability that the jury would have had a

20

reasonable doubt respecting Petitioner's guilt if Robin Johnson and Derrick Holmes had testified is not as clear.  Magistrate Judge Angell noted the evidence against Petitioner was not overwhelming.  The testimony of the Commonwealth's two main eyewitnesses, Alexander and Jackson, were both contradicted by their earlier police statements that they could not identify the culprits of Goldsby's shooting.  Petitioner's alibi defense was not fully credible either.  At trial, Petitioner testified he heard Goldsby was shot at 10:30 or 11:00 p.m.; but upon cross-examination, Petitioner conceded he previously reported to police that he heard about the shooting at 9:20 p.m.  Moreover, Petitioner's testimony that he carried twenty dollars in his pocket the night of Goldsby's murder contradicted an earlier statement to the police that Petitioner had only two dollars in his pocket that night.  The trial testimony of Petitioner and defense witness Jackson do not present a credible or consistent alibi defense.

The testimony of Robin Johnson and Derrick Holmes would have supported Petitioner's alibi defense, but the court is not convinced there is a reasonable probability this testimony would have created a reasonable doubt in the minds of the jurors.  Neither Robin Johnson nor Derrick Holmes were eyewitnesses to the shooting.  Robin Johnson and Derrick Holmes could only have testified that they did not see Petitioner in the area immediately prior to the shooting.  Such testimony fails show that Petitioner was not in fact in the area, and the court does not find such testimony would cause the jury to doubt its guilty verdict.

Petitioner argues Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006) mandates a finding in his favor.  The facts of Rolan are distinguishable.  In Rolan, the petitioner presented a self-defense theory at his trial for murder; he claimed he and his cousin were involved in a dispute with Paulino and Francisco Santiago over the proceeds of a drug sale.  Id. at 674.

21

According to Rolan, during the argument, Francisco Santiago left to urinate in an abandoned building in which neighborhood residents stored guns and drugs; Rolan followed Francisco Santiago into the building to continue the argument.  Id.  Paulino Santiago then entered the building with what Rolan believed to be a knife; shouting a threat at him, he charged Rolan.  Id. Rolan claimed he noticed a loaded rifle nearby, picked it up, and killed Paulino Santiago with a single shot.  Id.  Prior to trial, Rolan provided his defense counsel with the names of two potential witnesses: Robert Aponte and Daniel Vargas.  Id. at 675.  There was no record that defense counsel attempted to contact Aponte or Vargas.  Id.  Rolan was convicted of first-degree murder and possession of an instrument of crime.  Id. at 674.  At an evidentiary hearing on the Rolan's PCRA petition, Vargas stated he would have testified on his behalf that when Rolan went into the abandoned house, he was carrying only a quart of beer; Francisco Santiago followed Rolan into the house; then Paulino Santiago came around the corner carrying a kitchen knife and went into the house after the petitioner, screaming, "I'll kill you, motherfucker!"  Id. Vargas then heard a shot, went into the house with Aponte, and found Paulino Santiago lying on the ground with a knife at his feet.  Id.  The court found defense counsel's failure to investigate Aponte and Vargas fell below an objective standard of reasonableness, and was prejudicial to the Rolan's defense.  Id. at 682, 683.

       The facts in support of Petitioner's claim of prejudice are much less favorable. Neither the testimony of Robin Johnson nor Derrick Holmes would have directly supported Petitioner's alibi defense: they were not with Petitioner at the time of Goldsby's murder.  The testimony, even if believed, would have failed conclusively to show that Petitioner was not at the scene of the murder.  Though Robin Johnson and Derrick Holmes testified they did not see

Petitioner at the scene of the murder, they may have failed to notice him.  In contrast, in <u>Rolan</u>, Vargas presented positive testimony that he saw Rolan walk unarmed into the building; he saw the decedent, screaming a threat, follow with a kitchen knife; and he saw the decedent lying on the ground with a knife at his feet.  If believed, the Vargas testimony would have directly supported the Rolan's theory of self defense.  Here, if believed, the testimony of Robin Johnson and Derrick Holmes would not have directly supported Petitioner's alibi defense and caused a reasonable doubt in the minds of the jurors.

Because the alibi testimony of Petitioner and Duncan were weak and inconsistent, and because the testimony of Robin Johnson and Derrick Holmes would not have directly supported Petitioner's alibi defense, Petitioner has failed to show a reasonable probability that the testimony would have caused the jury to reasonably doubt Petitioner's involvement in Goldsby's shooting.  Therefore, Petitioner was not prejudiced by the ineffective assistance of counsel.

## V.    CONCLUSION

The R&R will be approved and adopted, and the petition for writ of habeas corpus will be denied.  A certificate of appealability will be granted.

23

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RONALD JOHNSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH D. LEHMAN, ATTORNEY** | : | |
| **GENERAL OF PENNSYLVANIA** | : | |
| **and DISTRICT ATTORNEY OF** | : | |
| **PHILADELPHIA COUNTY** | : | **NO.  94-7583** |

## <u>ORDER</u>

    **AND NOW**, this 31st day of May, 2007, upon consideration of Magistrate Judge M. Faith Angell's Report and Recommendation, Petitioner's objections thereto, and all other relevant papers, for the reasons stated in the accompanying memorandum, it is **ORDERED** that:

    1.    The Report & Recommendation (paper no. 76) is **APPROVED**.

    2.    The objections filed by Petitioner are **OVERRULED**.

    3.    The Petition for Writ of Habeas Corpus is **DENIED** and **DISMISSED** with prejudice.

    4.    A certificate of appealability will be **GRANTED**.


    /s/ Norma L. Shapiro

                            S.J.